CLARENCE E. McMANUS, Judge.
| ¡.Defendant, Rigoberto Funes was charged with four counts of second degree murder[1]. After count II of the indictment was quashed, defendant proceeded to trial on counts I, III and IV[2]. Defendant was found guilty on all three counts by a jury verdict of eleven to one. Thereafter, defendant was sentenced to life imprisonment on each count, consecutive, to be served without benefit of probation, parole or suspension of sentence. After the denial of his motion to reconsider sentence, defendant filed this appeal.
FACTS
Detective Keith Locascio of the Jefferson Parish Sheriffs Office Homicide Division, testified that he responded as the lead officer relative to a shooting at Gomez’s Bar, in Jefferson Parish, on October 80, 2008. He arrived on the scene at approximately 2:40 p.m. Before entering the building, Locascio observed three | sHispanic male suspects in custody in the parking lot to the left of Gomez’s Bar. One of the suspects, later identified as Mario, was receiving medical attention for gunshot wounds and being placed in an ambulance. The other two suspects, later identified as defendant and Garcia, had blood on their hands and clothing. Based on his observations and the forensic evidence, Locascio was able to conclude that defendant and Garcia carried Mario out of the bar, down the sidewalk toward Eise-man Street, and across a field. Defendant and Garcia were later transported to the investigation bureau located at 725 Maple Avenue. Through further investigation, two additional suspects were identified, apprehended in Texas, and charged in connection with the shootings at Gomez’s Bar: Navarrete-Duran, and Escobar. In total, five suspects were arrested and charged.
Locascio described the scene as “extensive,” explaining that the outside of the bar had “blood product” (blood), a flip-flop, and a hat. He also explained that the inside of the barroom contained scattered money, “blood product” (blood), casings, and weapons.
He further described the layout of the bar. Upon entering, there were two pool tables on the right side of the barroom. The bar, which ran almost the entire length of the room, was on the left side. Next to the pool tables along the right wall were tables, one of which contained two beer bottles, which were collected as evidence because Locascio believed that the suspects were “shooting pool and drinking.” Located behind the bar was a cash register drawer on the floor, with a key, receipts, and U.S. currency lying on the floor next to it.
Near the back right end of the bar was a card table. There were three video poker machines along the left wall near the bathrooms. In between the video poker machines and the card table was a door and hallway that lead to a kitchen area and *494 |4another hallway. The kitchen area led to the other hallway, which contained three rooms and a bedroom, the middle room was designated as the office.
The office was cluttered. It contained a desk and “a lot of paperwork.” Behind the door in the office were file cabinets and two large safes. The safes were opened but undisturbed. A handgun and U.S. currency were found inside of the safes.
Upon approaching the inside of the barroom, Locascio observed that Carmadelle was being taken out of the barroom by paramedics and Hebert was still receiving medical attention. Wallace and Beauford were both pronounced dead on the scene. Wallace was located in the back of the barroom near the second pool table, closer to the right side of the building. Beauford was directly parallel to the bar, toward the back end. Through investigation, Locascio was able to determine that Hebert was near the video poker machines. He was also able to determine that Carmadelle was positioned right behind Wallace, very close to the right wall and the card table in the back right corner of the bar.
Locascio also learned several weeks later that there was a possibility that a shot was fired in the office at Gomez’s Bar so he returned to the location with a crime scene technician. A second search of the office revealed a bullet penetration mark in the cement wall by the door frame. Ballistics evidence revealed the use of three weapons, one .22 caliber, and two .38 caliber weapons. However, through additional investigation, Locascio was able to conclude that four guns were actually involved in the incident.
Deputy Rhonda Goff of the Jefferson Parish Sheriffs Office, Third District Patrol Division, testified that on October 30, 2008, at approximately 2:00 p.m., she was driving to the Third District, on Walker-town Way, to attend roll call. As she approached the intersection of Fourth and Eiseman Streets, in Marrero, she | ¿observed three Hispanic males, with a large amount of blood on them, standing outside of the door to Gomez’s Bar, 6109 Fourth Street. One of the suspects was being carried by the other two suspects. As she was driving up, the three men were walking towards her; however, they cut across a field next to the bar and began traveling down Eiseman Street away from the deputy.
Goff turned her lights on and gave her location and observation to the dispatcher. She observed two of the suspects, one who was later identified as defendant, carrying the third injured male suspect in between them. She pulled behind the three men, exited her car, and asked them what was wrong, while pointing to the male being earned. The men started speaking Spanish so Goff assumed that they did not speak English. Goff then said: “Put him down.” “When they put him down,” his shirt raised, and Deputy Goff observed a round hole in his side that she believed to be a gunshot wound.
Goff then notified the radio dispatcher that there was a shooting and requested an ambulance. At that time, some white males approached Goff warning her to “[wjatch out” because “[tjhey just shot four people in the bar.” Goff immediately forced the two males, who were not shot, on the hood of her car and handcuffed both of them as quickly as possible. After the two males were handcuffed, she performed a weapons search, attempting to locate firearms. While checking the waistband area for firearms, Goff retrieved approximately six men’s wallets, which were collected as evidence. She threw one of the wallets on the hood of her unit and it opened revealing the driver’s license of an older white male that did not resemble any *495 of the suspects. Goff also performed a pat down search of the wounded suspect and recovered “a bunch” of wallets in his pockets. There were no firearms retrieved from the suspects. She then called for immediate backup and four ambulances.
IftAfter two additional officers arrived on the scene, they took custody of the three suspects, and Goff immediately went inside Gomez’s Bar to attempt to assist the people inside. When she opened the door, she “spooked one of the older guys,” later identified as Stanley Gomez, hereinafter Stanley, and he picked up a revolver and pointed it at her. She told him to put the gun down and he informed her that his brothers were dead. Goff again commanded Stanley to put the gun down and exit the bar and he complied; however, he placed the gun on the top of the pool table rather than back on the ground from where he retrieved it.
Goff proceeded to go inside of the bar where she observed “blood and money and bodies everywhere.” She described the scene as “something out of Hollywood.” Two victims were face up, one was “obviously dead,” and the other was not moving. Another victim was face down and he was not moving either. There was one male, later identified as Carmadelle, lying near the pool table moving, so Goff went to him and started talking to him in an attempt to comfort him and to see if he could identify the perpetrators. While in the bar, Goff came upon approximately five or six older men, who were either hiding behind the bar or in the back of the building. She told them to leave and tried to keep them from stepping through the crime scene.
Once backup arrived, including Sergeant Rene Lacombe, who took control of the scene, Deputy Goff began securing the scene and the witnesses. Once EMS arrived, Goff took the witnesses with her to obtain their names and contact information. At that time, one of the witnesses gave her a napkin with a license plate number on it. Goff then transmitted the license plate information to the dispatcher.
Ryan Brown, a paramedic for West Jefferson Medical Center testified that he responded to the shooting incident at Gomez’s Bar in a “Sprint vehicle.” Brown 17testified that as a paramedic supervisor, he worked on a “Sprint vehicle,” which usually arrives first to access the conditions of the injured parties. Brown stated that an ambulance usually has a paramedic and an EMT, and they transport to the hospital. A “Sprint vehicle” has the same capabilities as an ambulance, and it usually has a paramedic, but the unit would not transport.
Brown further testified that he was the first medical personnel to arrive on the scene. When entering the barroom, Brown observed four gunshot victims lying on the ground in pools of blood. Brown stated that he triaged the patients, which means that he assessed them to determine the condition and viability in each patient. He did not remember seeing any police officers inside of the bar while he was there. The first two men Brown approached were not breathing and did not have a pulse. The third person Brown approached was breathing, so he decided that he would attempt to resuscitate him. When his crew, of at least four, arrived a few minutes later, Brown assigned them to check the fourth person while he was taking care of the third. The two people, who were still alive, were located in the back corners of the barroom on the opposite sides of the pool tables.
Brown stated that once resuscitation attempts are started, they are not stopped even if a patient goes into cardiac arrest. He further stated that one of the two patients actually went into cardiac arrest. The two patients in the bar along with *496 another patient, who was outside, were transported to University Hospital. Although Mr. Brown did not participate in the transportation of the two patients inside the bar, he later learned that “they did not make it.”
Mr. Brown described a photograph introduced by the State explaining that he was running a baseline EKG strip pronouncing one of the victim’s dead, and his crew was working behind the bar, trying to “revive someone back.” He also | ^explained that the picture depicted money and blood all over the floor, a dead victim with blood soaked clothes, and a pistol on the pool table.
Mandy Mura testified that at the time of the incident, she was a paramedic for West Jefferson Hospital and responded to a call in reference to a shooting at Gomez’s Bar. She was the third unit to arrive on the scene at approximately 2:15 p.m. When she arrived, one patient from inside of the bar had already been placed in a unit for transport.
Mura described the scene as “... something out of a movie, like a horror movie or ... a Mafia style movie.” She testified that it was one of the bloodiest scenes she had seen in her career and the worst scene she had ever attended. She stated that it was difficult to avoid stepping in blood and leaving footprints. Upon entering the barroom, Mura observed one patient next to the bar, one patient at the back foot of the bar, and one near the pool table.
After entering the barroom, Mura communicated with her supervisor, Ryan, who directed her to assist a patient on the scene. She initially assisted with one patient located near back left of the barroom, who went into cardiac arrest. She and her colleague, Brent Rodriguez, worked on that patient then she was assigned another patient, who was located outside in an empty lot next to the building.
There was also a patient lying by the bar, who was not breathing and pulseless. He was placed on a monitor to verify that there was no electrical activity in the heart and Ryan called University Hospital for a do not resuscitate order. Mura’s second patient was treated outside of the bar for a gunshot wound to the abdomen and a graze wound to the head. Mura and Brent Rodriguez treated the patient and transported him to University Hospital where he went into surgery for his critical wound to the abdomen. Mura was not aware if the patient survived.
| sDeputy David Chapman, a crime scene technician for the Jefferson Parish Sheriffs Office, testified that he was the first technician to arrive on the scene at Gomez’s Bar. Under the direction of his supervisor, Colonel Tim Scanlan, he took photographs and measurements then collected, packaged, and secured the evidence. Chad Pittfield and Michael Aik-land were also present on the scene. Among the evidence collected from inside the bar by Chapman was a pair of flip-flops, a .38 caliber Smith and Wesson revolver, a .38 caliber Llama semi-automatic handgun with magazine, a cash register drawer, 6 cartridges obtained from the .38 caliber Llama handgun, an unknown caliber fired cartridge case, 5 special fired cartridge cases from the revolver, another unknown caliber fired cartridge case, one lead-like fragment, another .38 caliber special cartridge, one bullet, and another unknown caliber fired cartridge case. Chapman also obtained DNA swabs; however, he was unsure of exactly how many swabs were taken. Chapman was not able to lift any fingerprints from the. scene.
Dr. Karen Ross, an expert in forensic pathology, testified that she performed autopsies on the shooting victims at Gomez’s Bar. She further testified that she went *497 to the scene at Gomez’s Bar on the day of the incident to perform a cursory exam. Wallace and Beauford’s bodies were still on the scene and Carmadelle and Hebert had already been transported to the hospital.
Ross testified that Beauford died from a gunshot wound to the back. The bullet went through his spine, aorta, esophagus, windpipe, and heart; it was recovered from the front of his chest. Ross also testified that Wallace died of a gunshot wound to the chest and abdomen, which was shot from close-range. The bullet went through his upper chest, sternum, heart, diaphragm, stomach and exited out of the left side of his body. Wallace also had an abrasion and laceration on his head, which was consistent with his head striking the floor after he had been shot.
| inIn addition, Ross testified that Carma-delle died from a gunshot wound to the chest from a “small caliber” bullet. The bullet entered into his left upper chest, passed through his lung and ribs, and was recovered in the soft tissue of the back. Carmadelle also had an additional gunshot wound that entered beneath the navel and was recovered from the fatty tissue just below the skin. This additional wound contributed to his death; however, the wound to the chest would have been singularly lethal. Ross believed that the bullet that entered through the navel was from a “medium caliber” bullet. Ross was of the opinion that the bullet from the navel wound passed through another target or object before entering into Carmadelle. She reasoned that it was unlikely for a bullet to enter the body and “just go into the fat.” (Id.) Based upon Carmadelle’s position when he was shot and the information regarding Wallace’s position, Ross concluded that the bullet recovered from just below the skin on Carmadelle was likely the bullet that went through Wallace’s body. Finally, Ross testified that Hebert died of a gunshot wound to the chest, which entered on the left side of his back, passed through the left lung, the spine, the inferior vena cava, which is a major blood vessel, and the right lung, from where it was recovered.
Ross explained that from the four autopsies performed, she recovered four bullets which were turned over to the Sheriff’s Office. The bullets were from the stomach and mid-back of Carmadelle, the right lung of Hebert, and the anterior left chest of Beauford.
Sergeant Rodney Naumann, a crime scene technician for the Jefferson Parish Sheriffs Office, testified that on the morning after the incident, he collected evidence for processing. Specifically, he collected defendant’s clothing, which included a blue striped shirt and a pair of gray pants, from the detective’s bureau on Maple Avenue. He also collected evidence from the Coroner’s Office, L including bullets from the stomach and mid-back of Carmadelle, the right lung of Hebert, and the left anterior left chest of Beauford. Naumann did not obtain any bullets from Wallace. He further collected latent fingerprints, photographs, a black Adidas cap, and brown gloves from a 2006 Honda Accord, which was located at the detective bureau on Maple Avenue. Locascio was also present when Naumann processed the car for evidence. Naumann admitted that he did not examine any fingerprints; he only attempted to lift them from the vehicle.
Stanley Gomez, who was 84 at the time of trial, testified that Wallace and Beau-ford Gomez were his brothers. He testified that his father opened Gomez’s Bar at its current location in 1941 and shortly thereafter he began cashing checks for the employees at Johns Manville, which was located across the street from the bar.
*498 On the day of the incident, Stanley arrived at the bar at approximately 9:00 a.m. At 2:00 p.m. “five Mexicans,” came into the bar. They ordered “beer and Cokes,” and walked over to the pool table and picked up some pool sticks. They were talking and “kind of bunched up.” Next, they broke away and pulled out guns. Stanley admitted to seeing three men with guns; however, he declared that “as far as he could see, they all had guns.” They went to the patrons and took their wallets at gunpoint. “One of them” took his brother, Wallace, put a gun to his head and brought him to the back where the safe was located. Stanley went to the storeroom, located on the left behind the bar, and one of the robbers, later identified as Mario, came in with a gun and told him to come out. At some point during the robbery, Stanley’s wallet was also taken, but it was later returned by the Jefferson Parish Police Office.
Later, the robber who brought Wallace to the back came out running with a sack, yelling something in “Mexican [sic].” Stanley was not sure what he was | ^saying but he thought he was saying “I got [sic] the money. Let’s go.” The perpetrator ran out and the other perpetrators followed, except for Mario. Mario went behind the bar, and pulled a gun on John, the bartender, who opened the register. When the register opened, it “jumped out,” and fell on the floor. Mario took the money out of the register and stuffed it into his pocket.
Wallace came from the kitchen, carrying a pistol in his hands. At that time, someone yelled: “There’s one of them right by the bar there.” Wallace then said: “Hey, you one of them guys?” Mario turned around with a pistol in his hand and he and Wallace started firing. Stanley did not know who fired first because they were too close together.
Wallace looked like “he was firing his gun automatically like, like he didn’t know what he was doing.” Stanley observed Wallace and Beauford fall. When Wallace was falling, he was still shooting.
Stanley immediately went behind the bar, closer to the back end, and called 911. While he was on the phone, two of the robbers walked back inside and began firing. Before ducking behind the bar, Stanley observed that the robber on the right had a weapon that jammed and he threw it on the floor by the pool table. The robber on the left continued to fire, and they both picked up Mario and “dragged” him outside.
When the firing stopped, Stanley checked for a pulse on his brothers, Wallace and Beauford, but he could not feel one on either of his brothers. At that time a Jefferson Parish deputy drove by the bar and stopped. After being forced to exit the building, Stanley was later informed that Carmadelle and Hebert had also been shot. Contrary to Goffs testimony, Stanley testified that he never picked up a gun and placed it on a pool table at the direction of a Sheriffs deputy.
11sPatrick Henry Smith and Donald Lo-vas, both regular patrons, testified that they entered Gomez’s bar together at approximately 2:00 p.m. on the day of the incident. Smith, who was 85 at the time of trial, admitted that he was blind on his left side; however, he observed some men playing pool when he entered the bar. Smith testified that he went to the bar with his money in his hand because he did not know if he was going to have to pay. Lovas testified that he and Mr. Smith saw two of their friends, Carmadelle and Dominick, they approached their friends at the bar, and he bought everyone a round of drinks. Then Lovas heard someone speaking in broken English saying: “Go to the back. Go to the back.” As Lovas *499 proceeded to the back, he felt a hand go into his pocket and remove his wallet. Lo-vas glanced to the right and saw a semiautomatic pistol, and, at that point, he realized a robbery was taking place.
Smith testified that he and Lovas stood next to Carmadelle, then the robbers tried to take his money out of his hands. He would not release the money so he was knocked down against the pool table. When he got up, he directed Lovas to follow him toward the back of the building and stopped when they reached the kitchen area.
After entering the kitchen, where they were now behind a cement wall, Smith dialed a 911 operator. Smith heard a “commotion,” which he described as five or six gunshots. Lovas also heard multiple gunshots.
During that time, Smith testified that he observed Wallace exit from the back of the building, walking in the hallway toward the front of the building. Lovas testified that after the shots subsided, he saw Wallace, the owner, walk through the kitchen into the main bar with a .38 pistol in his hand. After Wallace went back into the bar area, Lovas again heard shots.
| ,4Both Smith and Lovas stayed in the kitchen until it was quiet and the police arrived; then they walked to the door where they were met by the police. While instructing Smith and Lovas to exit the bar, the policeman told them not to step in the blood or talk about the incident. When they were walking out of the building, Smith observed Hebert lying face down between the bar and the poker machine. He also observed Beauford lying face up next to the bar. Lovas observed both brothers, Beauford and Wallace, motionless, near the end of the bar. When Smith exited the building, he sat up against the fence next to the bar. Smith subsequently went to the lockup and gave a statement to Sergeant Cummings. Lo-vas also gave a statement to the police and his wallet was returned to him a couple of days later. Both Smith and Lovas were unarmed on the day of the incident.
Keith Cummings testified that he lived in a boardinghouse upstairs from Gomez’s Bar both at trial and at the time of the incident. Cummings testified that he was downstairs in Gomez’s Bar on the day of the incident. He was sitting at a round card table located behind two pool tables, which were on the right side of the building, across from the poker machines, and just before the doorway leading to the back of the building. While reading the newspaper, he heard the door open, looked up, and observed a group of four or five “clean-cut,” Hispanic males come into the building. The men ordered some beer and went by the pool table. Cummings continued to read his newspaper, and when he looked up, he observed a man in front of him “waiving a big ole pistol.” The pistol was not pointed at Cummings and at first he “thought it was a joke.” Then, he heard “some other guys” telling everybody to get up and go into the back. The men were speaking in broken English. He saw Wallace come out from the back of the building and he said: “What? Not again.” Then one of the men pointed what looked like a .357 Magnum at Cummings’ head. Cummings kept all of his belongings in a plastic hsgrocery bag, which was by his feet, so he emptied all of his pockets showing the man that they were empty. Next, the man with the .357 Magnum brought Wallace to the back of the building "with a gun pointed to his head. One of the men went behind the bar with John, the bartender. The people remaining were gathered by Cummings, near the card table, the poker machines, and doorway leading to the back of the building.
*500 Subsequently, Cummings heard what sounded like a metal object coming from the back. Shortly thereafter, the man came running out of the back, yelling, and several of the Hispanic males “ran out the front door.” Cummings looked back through the hallway and observed Wallace walking “pretty fast,” holding a gun. Wallace passed Cummings when somebody said that one of the perpetrators was still behind the bar. Wallace stopped and the man at the bar came around the bar behind Cummings and “ran into Wallace.” The man and Wallace “exchanged gunfire at point blank range. Cummings stated that multiple shots were fired by both men, but Wallace shot first. Cummings then noticed blood spatter out from the assailant’s back onto his shirt and it appeared as if the bullet passed through his back. At that time, Cummings noticed Beauford, who was right in front of him, fall off of his chair. Shortly thereafter, Wallace “went down.” Wallace was still moving; however, Beauford was not. Cummings immediately went toward the back of the building, down the hallway, and tried to get out of the back room, but he could not get out because the gate was locked. Shortly after, Patrick Smith came into the room on his phone; however, he did not see Cummings because he was blind on one side.
At that time, Cummings went back out to the front, looked around, and found a “massacre.” He observed Carmadelle, Wallace, Beauford, and Hebert lying on the floor. The entire barroom was covered in blood. Cummings exited lifithrough the front of the building, and although he tried to avoid it, he stepped in blood on the way out. He walked outside and observed Stanley talking on the phone with a 911 operator. Stanley appeared very upset and distraught.
The police arrived and Cummings flagged them down and informed them that they needed four ambulances immediately. Later that day, Cummings gave a recorded statement at the Sheriffs Office.
Earl Scioneaux, a regular at Gomez’s Bar, testified that he knew the Gomez family and he would often go there to cash checks. On the day of the incident, Scion-eaux went to Gomez’s Bar around 2:00 or 2:30 p.m. and cashed some checks. He would either give his endorsed check to Stanley or Wallace, and they would cash it in the back, in their office, which contained a safe. After cashing the checks, Scion-eaux started playing on the poker machines, near the back of the building.
Scioneaux observed that there were numerous people in the bar including: Car-madelle, Hebert, Cummings, whom he knew by the nickname “Baby Huey,” John, the bartender, and the three Gomez brothers, Stanley, Wallace, and Beauford. Scioneaux’s nickname was “Buffalo.” He also observed some Hispanic men playing pool.
Wallace was standing near Scioneaux by the poker machines waiting for people to come in and cash their checks. At some point, Scioneaux heard Wallace say: “You’ve got to be kidding. This is [sic] got to be some kind of a joke.” Scioneaux looked up and noticed a guy, he later identified as Escobar, “holding a pistol on Wallace.” When Scioneaux looked up, Es-cobar briefly turned and looked at him moving the gun in his direction. Escobar then turned back to Wallace Gomez and brought him to the back of the building down the hall to the right of the video poker machines.
117Next, Scioneaux heard “a lot of commotion.” He heard people asking what was happening then “they were herding them to the back.” Scioneaux did not see who it was gathering people towards the *501 back of the bar because he hardly turned around. Once he turned around, “this guy come [sic] up to [him] and told [him] to put [his] hands up and turn around.” Scion-eaux described the man as short and unarmed. Scioneaux stood up, took his hands and money out of his pocket, and dropped it on the table. The man went through his pockets, and took- his cell phone, wallet, and change. No one ever took the money on the table so Scioneaux attempted to hide it by pushing some “cartons” on the top of the money so they could not see it.
After the man who went through his pockets left, another taller man, who Scioneaux later observed wearing a red shirt in the police unit, approached him and told him to “put his hands up and turn around.” Scioneaux said: “Look, the other guy went through my pockets already.” The man then responded by telling Scion-eaux to “[s]hut up and turn around.” The man rummaged through his pockets for a second time.
After the second guy walked away, Scioneaux heard noise from behind the bar. At that time, he observed one of the perpetrators behind the bar. That perpetrator broke the drawer to the cash register, it fell, and he bent over to recover the money from the ground. Then, Escobar came running out of the back yelling something in Spanish and the men, who were robbing the bar, “took off.” By the way Escobar was gesturing, Scioneaux thought he said that he had the money. However, the perpetrator behind the bar remained, “still fooling with the money.”
By that time, Scioneaux retrieved the money he hid and backed into the hall where the dressing rooms were to count it. The dressing rooms were located on the left of the video poker machines. Wallace came out from the back with a Lspistol, and Scioneaux and another patron told him that they still had “one behind the bar.” At that point, the robber came from behind the bar, passed by Scioneaux, and reached Wallace. Scioneaux heard Wallace ask: “Are you one of them?” The robber turned around raising his hand and Wallace shot him. Scioneaux did not see that the robber had a gun, but he heard it being fired. Scioneaux then observed Wallace fall backwards. His head hit the floor and bounced. Also, the robber that Wallace shot slumped down in a sitting position.
At that point, Scioneaux heard people rushing in the door and the other robbers returned from outside, shooting inside of the barroom. Scioneaux clearly observed Escobar point a pistol directly at him so he backed up into the bathroom and remained there until the “commotion died down.” When he walked out, he observed Hebert lying on the side, bleeding through his mouth. Hebert was asking Scioneaux to help him and Scioneaux tapped him on the shoulder and told him: “Take it easy, Wayne. They’ve got an ambulance coming. They’re going to take care of you. Take it easy.” Scioneaux stepped over Hebert and observed Carmadelle lying against the wall behind the card table. He also saw Wallace and Beauford near the bar. There was a trail of blood going out, and a “cocked” pistol was lying on the ground near the door.
When Scioneaux went outside, he saw his cell phone on the ground near his car and picked it up. There was a police unit there, and a policewoman had three of the robbers; the one who had been shot was on the ground. The other two were standing there. Scioneaux observed that some of his stolen property was on the hood of the car and he was informed he would receive it later.
Thereafter, a male officer placed the men in handcuffs and informed them that *502 EMS was coming. Scioneaux later gave a statement to police.
liaMajor Maggie Pernia of the Jefferson Parish Sheriffs Office testified that she was born in Cuba, that Spanish was her first language, and she later learned English. She further testified she participated in the investigation relative to the quadruple homicide at Gomez’s Bar on October 30, 2008.
Over a six hour period, Pernia conducted two interviews with defendant, in Spanish. Prior to conducting the interviews, Pernia advised defendant of his Miranda rights in Spanish; however, the advisory was not recorded because it was given prior to the interview. Specifically, she advised defendant:
You have a right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to have an attorney present with you during questioning. If you can’t afford one, one will be appointed to you. If you choose to answer questions now, you still have a right to stop answering at any time.
After being advised of his rights, the defendant verbally indicated, in Spanish, that he understood his rights and he wished to waive them. Pernia admitted that she did not execute a waiver of rights form because the Spanish form was not readily available to her.
Pernia testified that in both taped statements, she advised the defendant that he had a right to remain silent, he did not have to talk to her, and that he could have an attorney. She specifically asked defendant if she treated him badly or forced him into making the statements to which he responded in the negative.
When Pernia took defendant’s formal recorded statement, she did not advise him of his rights again, rather she reminded him of those rights and stated them in brief. After confirming those rights for a second time, defendant again indicated that he understood his rights and wished to give a statement.
The transcript of defendant’s first statement reflects that defendant, his brother, Mario, Escobar, Navarrete-Duran, and Garcia went to Gomez’s Bar to “take the money and the phones” because the rent and utility bills werej^approaching their due dates. Navarrete-Duran, Escobar, and Mario had guns on their person. Defendant and Garcia were unarmed.
The group entered the barroom and defendant and Navarrete-Duran started playing pool. Then Escobar, Navarrete-Duran, and Mario pulled their guns out and they began searching people for their wallets. Defendant heard a shot and he and Garcia ran out because they did not have a weapon. Defendant noticed that all of his accomplices came out except for his brother, Mario, so he went back to look for him. When he re-entered the barroom, he observed that Mai’io and “other people” were on the ground. He picked up a .22 caliber firearm and realized it did not have bullets so he threw it. He also grabbed Mario, took his gun, and threw it. He stated that it appeared that Mario was trying to shoot but the bullets were stuck. Garcia helped him carry Mario out of the building, but the others [Navarrete-Duran and Escobar] had already left the scene in the vehicle. Shortly thereafter, the police came and stopped them.
The transcript of defendant’s second statement reflects that he had the .22 caliber pistol. It further reflects that Navar-rete-Duran asked a man at the bar if “they were cashing checks” and planned to steal the money from the safe. After hearing shots fired and exiting the bar, defendant re-entered the bar with Escobar and Garcia. When he saw his brother *503 “laying down,” he became afraid and “shot a group of peoples [sic],” then took his brother outside.
Colonel Timothy Scanlan, the Crime Lab Director for the Jefferson Parish Sheriffs Office, testified as an expert in firearms and toolmarks examination and crime scene reconstruction. Scanlan testified that he supervised the crime scene at Gomez’s bar. He testified that on the day of the incident, he directed the collection and preservation of evidence as well as rendered some reconstruction analysis in 121 the case. He also collected evidence from the detective’s bureau on the day of the incident and attended the four autopsies the following day.
In addition, Scanlan testified that he examined a Smith & Wesson military police revolver, a .38 special caliber, and a Llama, Model 3-A, a .38 caliber semi-automatic pistol, and numerous cartridges, casings, and bullets that were recovered from the crime scene. He also analyzed bullets recovered during the course of the autopsies of Carmadelle, Beauford, and Hebert. Scanlan was able to conclude that all five of the casings in the Smith and Wesson revolver were fired; however, a determination of when those shots were fired was not possible. Scanlan was able to conclude, however, that the revolver was discharged at the crime scene because a bullet from the revolver was recovered from Beauford.
Scanlan also testified that the Llama semi-automatic pistol jammed on the scene so ammunition was recovered in the weapon. In addition, one of the bullet casings recovered from the crime scene matched the semi-automatic weapon. It was further concluded that the bullet fired, which was fired from that particular casing was removed from Carmadelle.
Scanlan was able to determine that a third weapon, a .22 caliber semi-automatic weapon, was used at the scene. Although the weapon was not recovered, four fired cartridge cases consistent with a .22 caliber semi-automatic weapon were retrieved from the scene. Scanlan concluded that Carmadelle was also struck by a bullet fired from the .22 caliber semi-automatic weapon in addition to the Llama pistol. A bullet from the .22 caliber weapon was also recovered from Hebert.
Scanlan further testified that defendant tested negative for gunshot residue. However, he testified that there are numerous factors that can cause a gunshot residue test to have a negative result, including: sweat or blood on the hands, or 122using a .22 caliber weapon, which has a smaller power load and is less likely to deposit on a person’s hands. He further testified that he conducted tests in his lab where a .22 caliber weapon was fired and there were negative results “instantaneously and after a couple of hours.” Wallace tested positive for gun powder residue but he did not flee the scene.
Scanlan reconstructed the crime scene for the jury using a series of photographs and 3-D diagrams of the scene. Scanlan testified that the photographs depicted a blood trail that began in the barroom and continued outside about a half of a block. Scanlan testified that the blood trail was consistent with someone who suffered a wound and was bleeding inside of the bar, traveling outside to the corner of Eiseman Street.
Scanlan used the 3-D diagrams to depict the general location of the victims and perpetrators, both prior to and after the shootings. State’s Exhibit 65 and 66 depict Carmadelle, Wallace, Mario, and Beauford in an almost horizontal line right in the back of the barroom, behind the second pool table. Hebert was away from the other men closer to the video poker *504 machines. Scanlan also asserted that it was possible that the .22 caliber weapon was used to “fan” the room in gunfire.
Finally, Scanlan testified that Hebert and Mario’s wallets were recovered together on the scene. An additional wallet was also collected by Sergeant Chad Pittfield from the detective’s bureau. Scanlan testified that DNA was collected from the blood trail at the scene, but he was unaware of the results. Moreover, DNA is generally used to link a person to a crime scene so if a person is caught on the scene there is no need for DNA testing.
Lieutenant Kelly Carrigan of the Jefferson Parish Sheriffs Office Crime Lab testified for the defense. She testified that she processed some evidence in connection with the incident at Gomez’s Bar at the direction of Colonel Scanlan. I^She attempted to lift fingerprints from several items including a .38 caliber Smith and Wesson and a .38 caliber Llama. However, she was not able to lift prints from the guns and she did not swab them for DNA.
ANALYSIS
In his first allegation of error, defendant alleges that the trial court erred in denying his motion to suppress statements. Defendant contends that his statements were taken in violation of his Fifth and Sixth Amendment rights to the United States Constitution. Specifically, he argues that the State failed to carry its burden of proving a knowing waiver. In support of his argument, defendant asserts that the fact that the recorded waivers were deficient offers compelling evidence that the “off the record” advisory and waiver was likewise constitutionally inadequate. In addition, defendant contends that while Pernia represented that she was fluent in Spanish, the recorded statements demonstrate Pernia’s inability to effectively communicate the Miranda warnings to appellant in Spanish.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. State v. Franklin, 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04), 869 So.2d 817.
At the motion to suppress hearing, Captain Maggie Pernia (who was later promoted to Major) testified that she interviewed defendant in relation to a robbery which took place on October 30, 2008. She interviewed defendant twice. Pernia, who is bilingual, advised defendant of his Miranda rights in Spanish. Defendant | ⅞4verbally indicated that he understood the rights of which he had been advised. Defendant did not invoke his rights.
Prior to taking a second statement from defendant, Pernia reminded him of the rights she had read to him earlier and advised him that these rights were still in effect. Defendant verbally indicated that he understood his rights and wished to waive them to give a statement.
On cross examination, Pernia testified that she reminded defendant of his rights on a tape recording of the interview. Per-nia stated that she has previously been qualified as an interpreter in Criminal District Court (Orleans Parish) and in the 24th Judicial District Court although she does not believe she was officially certified in translation.
Detective Kevin Decker testified that he showed a photographic lineup to defendant *505 with the assistance of Deputy Jimmy Mendez, who speaks Spanish. Defendant was advised that he still enjoyed the Miranda rights he had previously been advised of. A written waiver of rights form was not executed by defendant. Deputy Mendez did not go over each and every Miranda right with defendant, but asked defendant if he was still aware of his rights.
Deputy Jimmy Mendez next testified that his appreciation during his interaction with defendant was that the statement and identification were free and voluntary. Defendant did not request counsel at any time. He was advised of a continuation of his rights prior to being shown a photographic lineup and taking a tape recorded statement. Finally, Deputy Mendez testified that defendant executed a written waiver of rights form, but this statement was contradicted by the State.
At the hearing, the State introduced a transcription of defendant’s statement taken at 2:50 a.m. on October 31, 2008. In the statement defendant agrees that he | jjswas advised of his rights, that he was still aware of his rights, and that he was giving the statement of his own free will.
In determining whether the trial court’s ruling on a defendant’s motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing, but may also consider the evidence presented at trial. State v. Huntley, 08-125, p. 6 (La.App. 5 Cir. 5/27/08), 986 So.2d 792, 796 (citing State v. Brumfield, 96-2667, p. 43 (La.10/20/98), 737 So.2d 660, 683, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999)). Pernia also testified at trial.
Pernia’s trial testimony appears to be substantially similar to her testimony at the suppression hearing. She testified that she conducted two interviews with defendant, in Spanish. Prior to conducting the interviews, Pernia advised defendant of his Miranda rights in Spanish; however, the advisory was not recorded because it was given prior to the interview. After being advised of his rights, the defendant verbally indicated, in Spanish, that he understood his rights and he wished to waive them. Pernia admitted that she did not execute a waiver of rights form because the Spanish form was not readily available to her.
Pernia testified that in both taped statements, she advised the defendant that he had a right to remain silent, he did not have to talk to her, and that he could have an attorney. She specifically asked defendant if she treated him badly or forced him into making the statements to which he responded in the negative.
When Pernia took defendant’s formal recorded statement, she did not advise him of rights again, rather she reminded him of those rights and stated them in brief. After confirming those rights for a second time, defendant again indicated that he understood his rights and wished to give a statement.
lafiAt trial, the State introduced a transcript of defendant’s first statement taken at 7:19 p.m. on October 30, 2008. The following exchange is included in the transcript:
CAPT. PERNIA: Rigoberto, before we started to record this, I told you, you didn’t had [sic] to speak with me. Is this true?
FUNES: Mm-hmm.
CAPT. PERNIA: You have to say yes or no.
FUNES: Yes.
CAPT. PERNIA: I told you, you could have an Attorney and what you may tell me could be used against you in Court. Have I advised you of all of this?
FUNES: Yes.
*506 CAPT. PERNIA: Ok, RIGOBERTO [sic] do you want to speak with me at this time?
FUNES: Yes.
Also at trial, the State introduced a transcript of defendant’s second statement taken at 12:24 a.m. on October 31, 2008. The following exchange is included in the transcript:
CAPT. PERNIA: But this is your second declaration — interview I done, truth?
FUNES: Yes.
CAPT. PERNIA: RIGABERTO [sic], you have the right to remain silent and to have a Lawyer [sic] present. Understand this.
FUNES: Yes.
CAPT. PERNIA: I have not forced you to talk with me, nor have I treated you badly [sic] Is this true?
FUNES: Yes.
| ¡^Whether a defendant’s purported waiver of Miranda rights was voluntary is determined by the totality of the circumstances. State v. Pugh, 02-171, p. 19 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 352. The critical factor in a knowing and'intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. Id.
Defendant argues that the “broken English” evidenced in the transcripts of the statements demonstrates that Pernia was not qualified to and did not communicate effectively with defendant in Spanish. However, the record reflects that Pernia was previously qualified as an interpreter in both Criminal District Court (Orleans Parish) and the Twenty-Fourth Judicial District Court and that Spanish was her first language.
Although defendant does correctly point out some grammatical errors in Pernia’s communications, with defendant, he does not allege that any of the errors are related to communication of his Miranda rights nor does he assert that the grammatically incorrect communications led to any misunderstanding or miscommunication whatsoever. Likewise, the transcripts of the statements reflect that defendant communicated in same manner, using grammatically incorrect statements, as evidenced by the translation in “broken English.” Contrary to defendant’s argument, the transcripts suggest that defendant understood Pernia in her communications with him. There was no point in the transcripts that would indicate that defendant did not understand what was being communicated to him.
Considering the totality of the circumstances, we believe that defendant in the instant case also knowingly and intelligently waived his rights and gave a voluntary statement. Converse to defendant’s assertions, the testimony and transcripts adduced at the hearing and at trial indicates that defendant was advised of his Miranda rights in Spanish prior to the time that he gave his first statement, |2she understood the advisory, and he voluntarily waived those rights. Furthermore, defendant was reminded of his Miranda rights in Spanish prior to the time that he gave his second and third statements and waived his rights at that point as well. Both the second and third statements also reflect that defendant was not forced to speak and that he gave his statements voluntarily.
While defendant also contends that a lack of a written waiver infers that he did not validly waive his rights, Louisiana courts have held that a written waiver is not necessary. See State v. Harvill, 403 So.2d 706, (La.1981).
*507 The trial court’s denial of a motion to suppress is afforded great deference and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Butler, 01-0907, p. 6-7 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124. Considering the totality of circumstances, we find that the trial and hearing transcripts and exhibits introduced therein reflect that defendant was advised of and voluntarily waived his rights prior to giving his statements.
The defendant’s first allegation of error is without merit.
In his second allegation of error, defendant contends that the three consecutive life sentences are constitutionally excessive because he is a young, first-time offender. Defendant further contends that he is not the worst offender for his crimes of conviction, yet he received the absolute maximum term of imprisonment available.
The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. State v. Nguyen, 06-969, p. 5 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 64, unit denied, 07-1161 (La.12/7/07), 969 So.2d 628. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the 123offense or imposes needless and purposeless pain and suffering. Nguyen, 06-969 at 5-6, 958 So.2d at 64.
Further, according to La.C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice, while recognizing the trial court’s wide discretion. Nguyen, 06-969 at 6, 958 So.2d at 64. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Allen, 03-1205 (La.App. 5 Cir. 2/23/04), 868 So.2d 877, 880. However, there is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-0227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503, 516, unit denied, 02-2900 (La.4/4/03), 840 So.2d 1213
In the present case after sentencing, defendant filed a written motion to reconsider the sentence. Defendant acknowledged that a life sentence was mandatory on all three counts and objected only to the consecutive nature of the sentences. In denying the motion to reconsider sentence, the court noted that defendant and his co-defendants actively planned an armed robbery and knew that the individuals in the bar were unarmed; nevertheless, defendant, who exited the bar, re-entered and “sprayed the room,” directly killing two people. The trial court found that the facts of the case were “heinous” and anything other than a consecutive sentence for each count would undermine the value of human life.
Now, for the first time on appeal, defendant appears to be arguing for a downward departure in his sentences arguing that he is a youthful first-time |snoffender and, further, that he not the worst offender for his crimes of conviction warranting the maximum possible sentence.
Second degree murder, however, carries a mandatory life sentence. LSAR.S. 14:30.1. A mandatory minimum sentence is presumed constitutional. State v. Royal, 03-439, p. 12 (La.App. 5 Cir. *508 9/30/03), 857 So.2d 1167, 1174, writ denied, 03-3172 (La.3/19/04), 869 So.2d 849. Further, Louisiana courts have consistently-held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. See State v. Lovick, 00-1833, p. 15 (La.App. 5 Cir. 5/16/01), 788 So.2d 565, 573, writ denied, 01-1836 (La.5/10/02), 815 So.2d 833, and cases cited therein. In State v. Hill, 98-1087, p. 15 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 698-99, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court recognized that “ ‘[t]he contention that a mandatory life sentence for second-degree murder is a violation of the constitutional prohibition against excessive punishment has been repeatedly rejected, even when the offender is a juvenile.’ ”
Nonetheless, a trial court may reduce a presumptively constitutional sentence if it determines the sentence makes no “measurable contribution to acceptable goals of punishment” or that the sentence amounts to nothing more than “the purposeful imposition of pain and suffering” and is “grossly out of proportion to the severity of the crime” as applied to a particular defendant. State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993). A court may only depart from the mandatory sentence if it finds clear and convincing evidence that would rebut the presumption of constitutionality. State v. Johnson, 97-1906, p. 7 (La.3/4/98), 709 So.2d 672, 676. Downward departures from mandatory sentences should only occur in rare cases. State v. Berniard, 03-484, p. 12 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 75, writ denied, 03-3210 (La.3/26/04), 871 So.2d 345.
[ 31 When a defendant seeks a downward deviation from the mandatory sentence, he has the burden to rebut the presumption of constitutionality by showing by clear and convincing evidence that he is exceptional, namely that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. Berniard, 03-484 at 13, 860 So.2d at 75. A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130.
In this case, defendant failed to argue for a downward departure under Dorthey in his motion to reconsider sentence. In that motion, he only argued against the consecutive nature of the sentences. Now on appeal, he argues that his status as a first time offender and age make the sentences unconstitutionally excessive.
The Court has found that a defendant’s young age alone does not provide sufficient grounds to deviate downward from a mandatory life sentence. State v. Kirkland, 01-125, p. 12 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 271, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415. Furthermore, a defendant is not entitled to a downward departure from the mandatory sentence for second degree murder just because he does not have a prior criminal history. State v. Emanuel-Dunn, 03-550, p. 11 (La.App. 1 Cir. 11/7/03), 868 So.2d 75, 83, writ denied, 04-339 (La.6/25/04), 876 So.2d 829.
Accordingly, we find that defendant failed to clearly and convincingly show that, because of unusual circumstances, he was a victim of the legislature’s failure |R!,to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. He gave no reasons to allow a down *509 ward deviation from the mandatory sentence of life imprisonment. Further, the sentences imposed were not unconstitutionally excessive and not grossly disproportionate to the severity of the offenses.
Defendant also argues that the consecutive nature of his sentence is unconstitutionally excessive because he received the maximum sentencing exposure.
Since the three convictions arose from a single course of conduct, there is a presumption in favor of concurrent sentences under LSA-C.Cr.P. art. 883. Nonetheless, a trial judge retains discretion to impose consecutive sentences on the basis of factors such as the offender’s past criminal acts, the violent nature of the charged offenses, or the risk defendant may impose to the safety of the community. State v. Aleman, 01-743 (La.App. 5 Cir. 1/15/02), 809 So.2d 1056, 1070, unit denied, 02-481 (La.3/14/03), 839 So.2d 26. If the trial court elects to impose consecutive sentences for crimes arising from consecutive sentences for crimes arising from a single course of conduct, it must articulate the reasons it feels the sentence is necessary. Id. Although the imposition of consecutive sentences requires particular justification when the crime arises from a single course of conduct, consecutive sentences are not necessarily excessive. State v. Jackson, 96-661 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, writs denied, 97-1050 (La.10/13/97), 703 So.2d 609 and 97-1255 (La.10/13/97), 703 So.2d 612.
In the present case, the trial court gave reasons for imposing a consecutive sentence both at the sentencing hearing and the hearing on the motion to reconsider the sentence. During sentencing, the trial court stated that the crime was “senseless, particularly when you put it in context of three lives, and you balance Lathe scale with a cable and a utility and a phone bill.” At the motion to reconsider the sentence, the trial court added that the facts of the particular case were “heinous” considering that defendant and his co-conspirators planned an armed robbery on a group of unarmed elderly men. The court opined that sentencing defendant to a concurrent sentence would undermine the value of human life.
We note that under similar circumstances courts have upheld consecutive life sentences. See State v. Pilcher, 27,085-KA (La.App. 2 Cir. 5/10/95), 655 So.2d 636, where the court affirmed the imposition of 2 consecutive life-without-benefits sentences for a 15 year-old defendant convicted of 2 counts of second degree murder; State v. Coleman, 32,906, p. 43 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, 1248, writ denied, 00-1572 (La.3/23/01), 787 So.2d 1010, where the court upheld defendant’s consecutive life sentences for two counts of second degree murder after noting the trial court’s considered defendant’s crime to be especially heinous in that he murdered two elderly victims during the commission or attempted commission of some type of robbery or aggravated burglary at the time the murders were committed causing a risk of death or bodily hard to more than one person; State v. Bibb, 626 So.2d 913, 940 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188, where this Court upheld consecutive sentences for two counts of first degree murder finding that the murders were separate and distinct events; however, even assuming the murders arose out of a single transaction, they were heinous and involved children; therefore, the consecutive, sentences were not excessive; and State v. Wood, 08-1511 (La.App. 3 Cir. 6/3/09), 11 So.3d 701, where the court upheld consecutive life sentences for three counts of second degree murder.
We do not find that defendant’s sentences were excessive because they were *510 consecutive. Moreover, assuming arguen-do that defendant’s sentence is excessive because of its consecutive nature, a remand for re-sentencing would be “an | ^academic exercise which has no practical benefit to anyone.” State v. Bradley, 02-1130 (La.App. 5 Cir. 3/11/03), 844 So.2d 115, 119. Because defendant in the present case previously received a life sentence without benefits, two additional life sentences have no practical effect as defendant will be in jail for the rest of his life unless he is pardoned. See Bradley, supra.
We find defendant’s second allegation of error to be meritless.
In his third allegation of error, defendant alleges that it was error for the trial court to charge the jury that a less than unanimous verdict was sufficient to convict defendant for an offense necessarily punishable by hard labor. Defendant recognizes that the United States Supreme Court in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), held that the Constitution does not compel unanimity for verdicts in state criminal cases. Defendant questions the vitality of Apodaca after the decision in McDonald v. City of Chicago, — U.S. —, 130 S.Ct. 3020, 3035, 177 L.Ed.2d 894 (2010), and as a result maintains that the non-unanimity instruction that resulted in his verdict and multiple life sentences was a denial of due process, contrary to the Sixth and Fourteenth Amendments to the U.S. Constitution.
LSA-C.Cr.P. art. 782(A) provides, in pertinent part, that “[cjases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” This article is a counterpart to LSA-Const. art. 1, § 17(A).
The United States Supreme Court has long held that non-unanimous juries do not violate a defendant’s Sixth Amendment right to trial by jury, made applicable to the states by the Fourteenth Amendment. State v. Thomas, 10-220, p. 11 (La.App. 5 Cir. 11/9/10), 54 So.3d 678, 685, writs denied, 10-2758 (La.4/25/11), 62 So.3d 89, 10-2752 (La.5/20/11), 63 So.3d 974 (citing Apodaca v. 35Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972)).
In State v. Belgard, 410 So.2d 720, 726 (La.1982), the Louisiana Supreme Court followed the United States Supreme Court’s jurisprudence, explaining that “ ‘[tjhis court has consistently held C.Cr.P. art. 782 does not violate the Sixth or Fourteenth Amendments to the United States Constitution.’ ” Thomas, 10-220 at 12, 54 So.3d at 685.
In State v. Bertrand, 08-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743, the Louisiana Supreme Court reversed the district court, which held Article 782 was unconstitutional and explained the following:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12-person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
As explained in Bertrand, supra, although the Apodaca decision was, indeed, a plurality decision rather than a majority one, the Louisiana Supreme Court has cit *511 ed or discussed the opinion various times since its issuance and on each of these occasions, it is apparent that the court considered that Apodaca’s holding as to non-unanimous jury verdicts represents well-settled law. Bertrand, 08-2215 at 6-7, 6 So.3d at 742.
As an intermediate appellate court, this Court is obliged to follow the precedent established by the Louisiana Supreme Court. Thomas, at 12-13, 54 So.3d at 686. Accordingly, this Court has followed the Louisiana Supreme Court’s jurisprudence in State v. Raymond, 08-1204, pp. 23-24 (La.App. 5 Cir. 4/28/09), 13 So.3d 577, 592-93, writ denied, 09-1205 (La.2/5/10), 27 So.3d 296, holding the |a(;trial court did not err in allowing the jury’s non-unanimous verdict of eleven to one. See also State v. Carter, 75 So.3d 1, 5-6 (La.App. 5 Cir. 2011); State v. Jacobs, 67 So.3d 535, 591-92 (La.App. 5 Cir.2011), where this Court upheld non-unanimous jury verdicts; and State v. Barbour, 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, writ denied, 10-934 (La.11/19/10), 49 So.3d 396, cert. denied, — U.S. —, 131 S.Ct. 1477, 179 L.Ed.2d 302, (2011), where the fourth circuit upheld a non-unanimous jury verdict and the supreme court recently denied review.
Defendant suggests that Apodaca is no longer good law in light of more recent jurisprudence from the United States Supreme Court, specifically, McDonald v. City of Chicago, Ill., — U.S. —, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). However, the substance of the McDonald opinion is clearly distinguishable, as evidenced by its holding that the Second Amendment right to keep and bear arms is fully applicable to the States by virtue of the Fourteenth Amendment.
We find defendant’s third assignment of error to be without merit.
In addition, we have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and find none which require corrective action.
CONCLUSION
For the above reasons, the defendant’s convictions and sentences are affirmed.

AFFIRMED

. Defendant was indicted along with co-defendants: Jose Cornejo-Garcia [Garcia], Ren-il D. Escobar-Rivera [Escobar], Mario A. Funes [Mario], and Pedro A. Navarrete-Du-ran [Navarrete-Duran]. The bill of information alleged that the victims were Wallace and Beauford Gomez [Wallace and Beauford], Wayne Hebert [Hebert], and Jeffrey Carma-delle [Carmadelle].

. Count II was quashed on motion by the defendant after the state declared that the preliminary facts suggested that victim Beau-ford was killed by a bullet fired by victim Wallace.