# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2021 KA 1346

## STATE OF LOUISIANA

## VERSUS

## KERRY ALEXANDER

Judgment rendered: ___JUL 1 3 2022___

\* \* \* \* \*

On Appeal from the
Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
No. 582999

The Honorable F. Hugh Larose, Judge Presiding

\* \* \* \* \*

Kristine M. Russell
District Attorney
Shaun Phillip George
Assistant District Attorney
Thibodaux, Louisiana

Attorneys for Appellees
State of Louisiana

Gwendolyn K. Brown
Baton Rouge, Louisiana

Attorney for Defendant/Appellant
Kerry Alexander

Kerry Alexander
Angola, Louisiana

Self-represented Litigant

\* \* \* \* \*

**BEFORE: GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.**

Guidry, J. Concurs.

**HOLDRIDGE, J.**

The defendant, Kerry Alexander, was charged by grand jury indictment with two counts of second degree murder, violations of La. R.S. 14:30.1, and pled not guilty on each count. After a trial by jury, he was found guilty as charged on each count.[1] The trial court denied his motions for post-verdict judgment of acquittal, new trial, and arrest of judgment. Defendant was sentenced on each count to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, to be served consecutively. The trial court denied his motion to reconsider sentence. The defendant now appeals, assigning the following as error in a counseled brief: (1) the trial court erred in not giving a requested special jury charge; (2) the trial court erred by imposing the life sentences consecutively; and (3) the trial court imposed excessive sentences. The defendant assigns the following as error in a pro se brief: (1) the evidence is insufficient to support the convictions; (2) the polling of the jury was unclear and non-compliant with La. C.Cr.P. art. 812; (3) the defendant was denied his constitutional right of confrontation; and (4) the defendant was denied his constitutional right to due process by the admission of other crimes evidence. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On December 15, 2018, between 2:00 and 3:00 p.m., officers of the Lafourche Parish Sheriff's Office (LPSO) were dispatched to the scene of shootings that occurred in the garage of a residence on Market Street, in Raceland, Louisiana, in a neighborhood called Greenville. The two victims of the shootings, Marcel Turner

---

[1] A previous trial in this matter was declared a mistrial on the fourth day of trial, on motion of the trial court, as a juror was excused from the panel and only eleven eligible jurors remained. The trial court reset the matter for a jury trial to commence one month later.

2

and Jeremiah Ballard, suffered and succumbed to multiple gunshot wounds.[2] After responding to the scene, the LPSO began receiving tips related to the shootings. Based on a detailed tip, LPSO officers were dispatched to an IHOP restaurant in Boutte, Louisiana, where they coordinated with deputies of St. Charles Parish to take the defendant and his brother, Jerrell Alexander ("Jerrell"),[3] into custody as suspects in the shootings.

Trevor Smith, an eyewitness at the scene of the shootings, came forward and identified the defendant and Jerrell in photographic lineups, as the two gunmen who entered the garage wearing masks that did not fully cover their faces. The defendant was taken into custody, advised of his **Miranda** rights,[4] signed a waiver of rights form, and participated in a recorded interview. During the interview, the defendant repeatedly denied having any knowledge of the shootings on Market Street or being in the area at the time.

## SUFFICIENCY OF THE EVIDENCE

In pro se assignment of error number one, the defendant notes that his motion for post-verdict judgment of acquittal was based on the lack of evidence in the record that he was ever properly identified as the perpetrator. On that basis, the defendant argues that no rational trier of fact could find that he is guilty beyond a reasonable

---

[2] Dr. Yen Van Vo of the East Baton Rouge Parish Coroner's Office, an expert witness in medical examination and forensic pathology, conducted the autopsies in this case. Turner sustained a fatal gunshot wound to his back that exited through his mid-chest. No projectiles were recovered from Turner's body. Ballard sustained potentially fatal gunshot wounds to the chest and back and a gunshot wound to his arm. A bullet projectile was recovered from the wound to Ballard's back.

[3] In a separate trial, Jerrell was also charged with and convicted of two counts of second degree murder pertaining to the killings in this case. On appeal, this court affirmed Jerrell's convictions and sentences. **State v. Alexander**, 2020-1337 (La. App. 1 Cir. 10/18/21), 2021 WL 4851320.

[4] Under **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the defendant was informed of his right to remain silent, that anything he said may be used against him, and that he had a right to retained or appointed counsel.

doubt or to a moral certainty. Thus, he concludes that the convictions should be reversed.[5]

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. C.C.P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Williams**, 2019-0077 (La. App. 1 Cir. 5/31/19), 2019 WL 2315340, at *2, writ denied, 2019-01060 (La. 10/1/19), 280 So.3d 158. The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1 Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

---

[5] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first assess the sufficiency of the evidence, see **State v. Hearold**, 603 So.2d 731, 734 (La. 1992), because the accused may therefore be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). Thus, we will first address the issue of the sufficiency of the evidence. The remaining issues, raised in the defendant's counseled and pro se briefs, will be addressed based on the order of their occurrence at trial.

Second degree murder is defined in pertinent part as "the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); **State v. Coleman**, 2017-1045 (La. App. 1 Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **State v. Currie**, 2020-0467 (La. App. 1 Cir. 2/22/21), 321 So.3d 978, 983.

The State bears the burden of proving those elements, along with the burden to prove the identity of the defendant as the perpetrator. **Coleman**, 249 So.3d at 877. When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. **State v. Bridgewater**, 2000-1529 (La. 1/15/02), 823 So.2d 877, 890, cert. denied,

5

537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). Under the law of principals, all persons involved in the commission of a crime are equally culpable. **State v. Posey**, 2008-0746 (La. App. 1 Cir. 9/26/08), 2008 WL 4376811, at *3. A person may be convicted as a principal to second degree murder even if he has not personally fired the fatal shot. **State v. Clark**, 20-167 (La. App. 5 Cir. 11/18/20), 306 So.3d 619, 631, writ denied, 2020-01459 (La. 2/17/21), 310 So.3d 1150. See also **State v. Massey**, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 463-64, writ denied, 2012-0991 (La. 9/21/12), 98 So.3d 332 ("Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime.").

In the instant case, Detective Terry Poiencot responded to the scene of the shootings as the primary investigator. Detective Poiencot observed a suspected bullet defect or bullet hole in the door that led from the garage into the kitchen and recovered three spent .45 caliber casings and one live .40 caliber round from the garage floor. The detective collected the various spent and live rounds to be sent to the Louisiana State Police Crime Lab (LSPCL) for testing.[6] After collecting evidence at the scene of the shootings, Detective Poiencot responded to the scene of the arrests at IHOP and observed a tattoo on the defendant's face, between his eyebrows.[7]

Smith, who identified the gunmen in this case, testified that Ballard (whom he called "Gutter") was his cousin, that they lived on the same street, and that he would see Ballard every day prior to the shootings. He further testified that Turner (whom

---

[6] Additional .45 caliber spent casings and baggies of marijuana (approximately 50 grams) were found at the scene. Forty-five dollars in cash was located by the door that led into the kitchen from the garage, near Turner's body, and a small baggie of marijuana was located in Turner's pocket.

[7] Detective Poiencot first described the defendant's tattoo as a "flaming star." He added that the defendant's tattoo was faded and stated that it could have been a crown or a cross. The mugshot in evidence shows that the tattoo is dark, faded, and difficult to discern.

6

he called "Marty") was his friend. Smith also knew the defendant and Jerrell before the shootings, as their mother sold sweets and snacks on St. Philip Street, within walking distance of Smith's residence. Smith testified that he would see the defendant "Every night[,]" adding, "Every time I go by his mom's I see him." Smith confirmed that he was familiar with the defendant's voice, body build, and body type. He further confirmed that the defendant had a distinguishing mark or tattoo on his face, which he described as, "[a] big cross." Smith noted that Jerrell had a smaller tattoo of a cross on his face.

Smith testified that on the day in question, he was at Ballard's house, playing pool in the garage before the shootings. Smith denied that he, Ballard, or Turner were armed that day. Smith testified that while they were in the garage, Lajohn Thomas, another male subject who Smith was familiar with, made a brief visit. Smith indicated that it was possible that Thomas purchased marijuana before he left. After Thomas left, the defendant and Jerrell entered the garage. Smith testified that although the defendant and Jerrell were wearing camouflage masks, he was still able to identify them due to their tattoos and the large openings in the masks. Smith further testified that the defendant was wearing black gloves, a camouflage jacket, and pants. He stated that both the defendant and Jerrell were carrying backpacks and both were armed with semiautomatic guns. Smith described the defendant's gun as "[a]ll black" and Jerrell's gun as "black with silver on top." Smith stated that the defendant pointed his gun at him and yelled to him, "Give it up." He noted that Jerrell did not say anything and only stood still and calm. Smith confirmed that he was afraid and intimidated by the defendant at that moment. However, he did not have any money at the time to give to the defendant and Jerrell at that time.

After the defendant's verbal command, Smith ran to the door that led from the garage into the house, and then heard gunshots. Smith stated that he did not see the

victims after the gunfire, noting that he never looked back. However, Smith noted that the defendant and Jerrell (along with the victims) were still in the garage when he ran inside the house. Smith encountered his aunt, Barbara Hester, once he entered the kitchen of the house.

Once Smith was able to exit the house, he ran to his residence, located a couple of houses down the street from the home where the shootings took place. His uncle later brought him to the police station and the restaurant in Boutte. Smith confirmed that he identified the defendant and Jerrell in photographic lineups.

Smith recalled telling the police that both the defendant and Jerrell were shooting their guns, though he testified that he did not actually see them shooting their guns. He noted that he had just made it into the house from the garage as the gunfire started and therefore was unable to see who was shooting. He testified that he heard "[m]aybe more than five" gunshots, though he told the police that it was ten gunshots. Regarding the discrepancies between his trial testimony and police statement at the time of the shootings, Smith confirmed that he was not trying to lie to the police or the jury stating, "It was quick. I was scared."

Thomas's prior testimony was presented at trial.[8] Thomas confirmed that he knew the defendant, Jerrell, and Ballard, and further confirmed that he bought marijuana from Ballard at Ballard's house on the day of the shootings. Thomas confirmed that Turner and Smith were also present at the time of the transaction. Ten or fifteen minutes later, Thomas made contact with the defendant and Jerrell on Market Street, as they were running from the direction of Ballard's residence.

---

[8] As will be discussed in addressing pro se assignment of error number three, before the trial began, the trial court ruled in favor of the State's motion to determine Thomas's status as an unavailable witness for the instant trial. Thus, the State played to the jury and additionally provided transcripts of Thomas's audiotaped testimony from the prior trial in this matter, which was declared a mistrial subsequent to Thomas's testimony.

Thomas testified that the defendant was wearing a camouflage jacket at the time and carrying a Louis Vuitton bag, while Jerrell had a Nike bag.

Kenzie Bumper testified that she contacted the police on the date in question. Bumper knew Thomas, describing him as, "My first love." On the date of the shootings, Thomas asked Bumper to give him a ride, as she often did. When he came to the door, he was alone. However, when Bumper went outside, two other males were with Thomas. Bumper did not know the other two males but described them as African American males who wear wearing hoodies at the time. She noted that one of them had a tattoo on his head that appeared as though his head had been stamped. She further noted that one of them was carrying a black or navy bag. Bumper identified the defendant in court as one of the unknown males. She noted that the two males looked like they could have been brothers or cousins. She gave them a ride to their mother's house on St. Philip Street, across from Thomas's grandmother's house. She noted that the other male was talkative, while the defendant did not speak and seemed, "Jittery, like his nerves was bad."

Folse, Smith's brother, testified that one of the victims, Ballard, was his cousin, that the shootings took place at his aunt's residence, and that he knew the defendant from meeting him a few times around the neighborhood. Folse noted that he spoke to the defendant on the day of the shootings. Folse specifically testified that he talked to the defendant around 9:00 or 10:00 a.m., and that the defendant asked him if he wanted to buy a gun or knew someone who wanted to buy a gun and if he knew "where a lick was at." Folse explained that he understood "a lick" as taking something from someone, adding, "jack somebody, rob somebody, things like that." He noted his response as, "No."

Folse noted that he had twelve missed calls after the shootings, including a call from the defendant. When Folse heard about the shootings at his aunt's house,

9

he suspected that the defendant had committed the shootings since the defendant had called him earlier that same day in reference to "a lick." Thus, Folse called the defendant back under the pretense of asking him if he still had the gun for sale. The defendant told Folse that he still had the gun and that he was at the RaceTrac. After contacting law enforcement, Folse called the defendant again to verify where the defendant could be found, and the defendant told Folse that he was at IHOP behind a dumpster. Folse immediately provided the police with the information.

An IHOP employee, Shawn[9] Clauson, informed the police that he observed the defendant and Jerrell each carrying a bag while outside of the restaurant that night. Near the restaurant dumpster, officers recovered two bags, a gray Nike backpack and a gray-checkered Louis Vuitton satchel-style bag, and a black Mossy Oak camouflage mask.[10] The Nike backpack contained a .40 caliber Smith and Wesson semi-automatic pistol with a silver top and black base, loaded with a single bullet in the chamber and additional bullets in the magazine, and a camouflage jacket. The following items were found in the jacket pockets: a Realtree camouflage mask, a live .40-caliber Winchester Smith and Wesson round, a pair of black and blue gloves, and a white medical or dust mask. The Louis Vuitton bag contained another Mossy Oak camouflage mask, a pair of Mossy Oak camouflage gloves, and a black Highpoint .45-caliber pistol loaded with five live bullets, consisting of one in the firearm and four in the magazine. Video surveillance footage of the restaurant that night, hours after the shootings, showed the defendant carrying the Louis Vuitton satchel-style bag and Jerrell carrying the Nike backpack.[11]

---

[9] The record shows the manager's first name interchangeably spelled "Shaun" and "Shawn."

[10] While one of the bags is a backpack-style bag and the other is a satchel-style bag that can be worn on the back, herein and at trial, both bags are interchangeably referenced as backpacks.

[11] Dark images captured on video footage taken outside, and still photos created therefrom, depict two individuals carrying backpacks outside of the restaurant. At one point, each of the individuals looked towards the camera, allowing their faces to be partially and briefly captured. Subsequent

10

During his recorded interview after his arrest, the defendant explained how he arrived in Raceland on the day in question. He stated that he met his brother at about 2:30 p.m. that day and that they smoked marijuana with another individual he identified as "Justin." The defendant stated that they went to Thibodaux and "chilled out" and noted that while they were at IHOP, he was waiting for someone he identified as "Folse" to pick him up and bring him to Laplace or Lafayette. The defendant repeatedly denied being in possession of a backpack that night or having any knowledge of a backpack. The defendant further denied being involved in or having any knowledge of the shootings on Market Street and denied being in the area that day. In reference to Market Street, the defendant specifically stated, "Right I I mean like I said, Market and all. I don't know nothing about hanging out. I don't know nothing about all of that area that ain't my my area. They got too much been going on and all I don't know nothing about that area."

Pursuant to search warrants, a DNA reference sample and gunshot residue (GSR) kit were collected from the defendant. Additionally, records were extracted from the cell phones that were secured and seized from the defendant and Jerrell upon their arrest. GPS location data from the defendant's cell phone and cell tower data showed that on the day of the shootings, the defendant's cell phone was pinging off the tower located at the back end of the Greenville neighborhood. Detective Poiencot matched the serial numbers of firearms depicted in an image recovered from the defendant's cell phone to the firearms recovered at IHOP. Further, a text message sent just prior to the date of the instant incident indicated that the defendant

---

footage shows the individuals outside without the bags, just before they entered the restaurant. Moments later, video footage taken inside of the well-lit restaurant and a still photo captured therefrom shows Jerrell and the defendant as they entered the restaurant. Jerrell is shown wearing a letterman jacket and beanie and the defendant is wearing a hoodie, again with no bags at that point. The items recovered at IHOP were sent to the LSPCL (Louisiana State Police Crime Lab) for testing.

11

was attempting to make arrangements to sell a firearm. Specifically, a message sent on December 12, 2018 states, "Wuzzup son I got a big 45 for sale right now for u." The recipient (a contact identified as "Zoe") responded, "Call me."

Jeff Goudeau, the firearm supervisor for the LSPCL and expert witness in the field of ballistics, testified regarding the analysis of the firearms, bullets, and spent casings in this case. Goudeau noted that to his knowledge, Highpoint is the only brand of .45 caliber firearm with seven grooves and a left-handed twist. Goudeau confirmed that the testing of .45 caliber spent casings collected from the scene of the shootings showed that they were fired from the Highpoint .45 caliber pistol in evidence. Testing further confirmed that the projectile recovered from Ballard's body was also fired from the Highpoint pistol.

Jodie Clements of the St. Tammany Parish Crime Lab was accepted at trial as an expert in gunshot residue analysis. Clements analyzed gunshot residue kits collected from the defendant's hands and Jerrell's hands. Clements identified four microscopic particles containing a combination of lead, barium, and antimonium from the defendant's kit. The test results of the defendant's kit showed that he may have discharged a firearm, been in close proximity to a discharged firearm, or come in contact with a surface containing primer GSR. Clements testified that based on the number of particles found in the defendant's kit, it is unlikely that cross transfer was the basis for their presence. Clements further testified that Jerrell's kit had two particles present. Clements noted that while the test results meant that Jerrell also could have discharged a firearm, been in close proximity to a shooting, or came into contact with a surface containing primer GSR, the presence of such a limited number of particles in Jerrell's sample has limited evidentiary value.

Elizabeth Hamilton, an expert witness in forensic DNA analysis and a former forensic DNA analyst with the LSPCL, received the following evidence for testing:

12

a pair of camouflage gloves, two camouflage masks, and reference samples for the defendant, Jerrell, and the victims, Ballard and Turner. Based on the results of her testing, Hamilton testified that the defendant could not be excluded as a major contributor to the DNA profiles taken from the left and right-hand gloves.[12] Regarding the DNA sample from the mouth area of the camouflage mask removed from the checkered bag identified as the bag being carried by the defendant, the defendant could not be excluded as the major contributor while Jerrell could not be excluded as the minor contributor.[13]

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Dorsey**, 2010-0216 (La. 9/7/11), 74 So.3d 603, 634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Lavy**, 2013-1025 (La. App. 1 Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

The verdicts rendered in this case indicate that the jury rejected the defendant's theory that he was misidentified in this case. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under

---

[12] As to the left-hand glove, no conclusions were made regarding the inclusion or exclusion of Jerrell as a minor contributor and the victims were excluded as one of the contributors. Due to the limited nature of the minor profile from the right-hand glove, no conclusions were made regarding the minor contribution.

[13] According to Hamilton's report, testing of the mouth area of the other mask showed that Jerrell could not be excluded as the major contributor, and the defendant and the victims were excluded as minor contributors of that DNA sample.

the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662. Folse testified that he talked to the defendant before the shootings and that during their conversation, the defendant wanted to know where he could get "a lick," which Folse interpreted as the defendant's desire to rob someone. Smith was present at the shootings, heard the gunshots, and identified the defendant and Jerrell as the gunmen. While they were wearing masks and Smith did not see the defendant or Jerrell fire their guns, Smith was certain of his identification of the defendant and Jerrell as the gunmen. Specifically, Smith testified that he knew the defendant and Jerrell well, that he saw them on a regular basis before the shootings, and that he knew the defendant's voice and body build. Smith stated that the defendant and Jerrell had distinguishing tattoos on their faces, and he noted that their face masks had gaps that allowed him to see who they were. He noted that both the defendant and Jerrell were carrying backpacks and both were armed with guns. Further, Smith testified that he saw the defendant and Jerrell brandishing their weapons right before the victims were shot. He described the defendant's gun as black, matching the .45 caliber firearm in evidence, and Jerrell's gun as black with silver on top, matching the .40 caliber firearm in evidence.

After the shootings, Folse called the defendant and inquired about the gun he had for sale. The defendant told Folse that he still had the gun and further told Folse that he was behind a dumpster at IHOP. The police watched video footage showing the defendant and Jerrell at IHOP after the shootings carrying backpacks. Subsequent footage showed they were still at the restaurant but that they were no longer carrying backpacks. The backpacks and the contents, including the guns, were in fact located by the dumpster at IHOP. The defendant's DNA was found on items recovered from the Louis Vuitton backpack that the defendant was observed carrying. Further, the .45 caliber firearm was located in the Louis Vuitton backpack,

14

and the defendant had significant GSR on his hands after the shootings. Ballistics testing showed that the .45 caliber firearm was used to fire the projectile recovered from Ballard's body and spent casings located at the scene. Moreover, while the defendant denied being at the scene of the shootings, his cell phone pinged a tower in the area. Considering the evidence detailed above, we find that the jury could have rationally concluded that the defendant was the shooter in this case or was at least the shooter as to Ballard and a principal to the shooting of Turner.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of each count of second degree murder and the defendant's identity as the perpetrator of the offenses. Pro se assignment of error number one lacks merit.

## RIGHT OF CONFRONTATION

In pro se assignment of number three, the defendant argues he was denied his constitutional right of confrontation when the trial court granted the State's pretrial motion in limine to determine the unavailability of a State witness, Thomas, and admit prior testimony at trial. The defendant quotes defense counsel's argument in

15

opposition to the State's motion, in which defense counsel claimed the State chose not to obtain Thomas's address despite speaking to him just less than a month before the reset trial. Defense counsel argued at the hearing on the motion in limine that Thomas would not be visible in court for the jury to assess his credibility due to the State's failure to serve the witness. The defendant now argues that the trial court erred in finding the witness unavailable.

The Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee a criminal defendant the meaningful opportunity to present a complete defense. **State v. Dressner**, 2008-1366 (La. 7/6/10), 45 So.3d 127, 137, cert. denied, 562 U.S. 1271, 131 S.Ct. 1605, 179 L.Ed.2d 500 (2011). The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." **Crawford v. Washington**, 541 U.S. 36, 42, 53-54, 124 S.Ct. 1354, 1359, 1365, 158 L.Ed.2d 177 (2004). The main purpose of confrontation rights is to secure for the defendant the opportunity to cross-examine. Cross-examination is the primary means by which to test the believability and truthfulness of testimony, and it provides an opportunity to impeach or discredit witnesses. **State v. Mitchell**, 2016-0834 (La. App. 1 Cir. 9/21/17), 231 So.3d 710, 723, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410.

Likewise, one of the primary justifications for the exclusion of hearsay[14] is that the adversary has no opportunity to cross examine the absent declarant to test

---

[14] Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C).

16

the accuracy and completeness of the testimony. An exception to the hearsay rule exists for testimony given by an unavailable[15] declarant as a witness in another hearing of the same or a different proceeding, "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." La. C.E. art. 804(B)(1). To protect the defendant's constitutional right to confront and cross-examine adverse witnesses, certain conditions must be met before the prior testimony may be introduced: (1) the defendant must have been represented by counsel at the earlier hearing; (2) the witness must have testified under oath; (3) the witness must have been cross-examined (or there must have been a valid waiver of the right to cross-examination); (4) at the time of trial, the witness must be "unavailable" to testify; and (5) the State must have made a good faith effort to locate the unavailable witness. Determining the unavailability of a witness is a preliminary question for the court. La. C.E. art. 104(A). Such determinations are reviewed for manifest error, and will not be overturned, absent an abuse of the trial court's discretion. **State v. Ball**, 2000-2277 (La. 1/25/02), 824 So.2d 1089, 1111-1112, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002).

Confrontation errors are subject to the harmless error analysis. **Delaware v. Van Arsdall**, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); **State v. Burbank**, 2002-1407 (La. 04/23/04), 872 So.2d 1049, 1051 (per curiam). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination was fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. **Van Arsdall**, 475 U.S. at 684, 106 S.Ct. at 1438. Factors to be considered by the reviewing court include the

---

[15] A declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. See La. C.E. art. 804(A).

17

importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. **Van Arsdall**, 475 U.S. at 684, 106 S.Ct. at 1438; **State v. Wille**, 559 So.2d 1321, 1332 (La. 1990). The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. **State v. Broadway**, 96-2659 (La. 10/19/99), 753 So.2d 801, 817, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (citing **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

Prior to the commencement of trial, the State moved to have the trial court determine Thomas's status as an unavailable witness.[16] The State noted that after the initial mistrial of this case, Thomas stated that he would not be available for the reset trial. The State informed Thomas that a subpoena would be issued for his attendance. According to the State, the subpoena was issued, and the State's investigator contacted Thomas's girlfriend, who advised that Thomas was in Alabama and would not be returning. Thomas was later contacted and stated he was in Georgia and would not be returning. The State noted that the license plate numbers for Thomas's vehicle and his girlfriend's vehicle were placed in the sheriff's office license plate reader system, such that they would be pulled over and served upon entering Lafourche Parish. Further, the State's investigator spoke to Thomas's father in a failed attempt to have further contact with Thomas. Therefore, the State moved for the admission of Thomas's testimony given during the initial trial, prior to it being declared a mistrial. The defense objected, stating that the State

---

[16] As previously noted, the initial trial of this matter was declared a mistrial on the fourth day of trial, after several witnesses, including Thomas, had already testified.

failed to follow the procedure to serve an out-of-state witness and that the new jury would be unable to visually observe Thomas. The trial court found that Thomas was unavailable, that the State made every reasonable effort to try to locate and serve Thomas, and that the defendant's rights would not be violated by the admission of the prior testimony, as the defendant's attorney previously subjected Thomas to cross-examination.

We find no abuse of discretion in the trial court's ruling. As stated by the trial court, Thomas was subject to cross-examination by the same attorney who represented the defendant during the instant trial. The jury heard all of Thomas's prior testimony, including the cross-examination. Further, the evidence presented at trial compels a finding that the guilty verdicts are surely unattributable to any error resulting from the defendant's inability to confront and cross-examine Thomas at the instant trial. Considering the eyewitness, DNA, and GSR evidence against the defendant in this case, Thomas's testimony was not necessary to prove the elements of the offenses in this case. Therefore, we conclude that the guilty verdicts rendered are surely unattributable to any confrontation error. See **State v. Buckenberger**, 2007-1422 (La. App. 1 Cir. 2/8/08), 984 So.2d 751, 759-60, writ denied, 2008-0877 (La. 11/21/08), 996 So.2d 1104. Thus, we find no merit in pro se assignment of error number three.

## OTHER CRIMES EVIDENCE

In pro se assignment of error number four, the defendant argues that his constitutional right to due process was violated when the trial court overruled his objection and allowed the State to introduce evidence that he smoked marijuana. The defendant notes that marijuana use was not an element of the offense and argues that it furthermore was not a proven fact. Thus, he contends that the convictions should be reversed.

19

Evidence of other crimes is generally inadmissible because of the substantial risk of unfair prejudice to the defendant. See La. C.E. art. 404(B)(1); **State v. Becnel**, 2016-1297 (La. App. 1 Cir. 4/20/17), 220 So.3d 27, 33, writ denied, 2017-1023 (La. 3/9/18), 238 So.3d 451. Louisiana Code of Evidence article 404B(1) provides several exceptions to this rule, including other crimes evidence that "relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." This exception, sometimes referred to as "res gestae," incorporates a rule of narrative completeness without which the State's case would lose its narrative momentum and cohesiveness. Such evidence forms part of the res gestae when the crimes are so related and intertwined with the charged offense that the State cannot accurately present its case without reference to it. The evidence completes the story of the crime by providing context to the events. See **State v. Taylor**, 2001-1638 (La. 1/14/03), 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004); **State v. Swan**, 2018-0320 (La. App. 1 Cir. 12/17/18), 2018 WL 6599023, at *15, writ denied, 2019-0151 (La. 5/20/19), 271 So.3d 1270.

While the defendant's pro se brief does not cite the portion of the trial being challenged in this assignment of error, we note that the defendant's use of marijuana was introduced in his own pretrial police interview. Therein, the defendant responded as follows when asked what he and Jerrell did on the day in question, "Oh, we just like smoked a lil weed, we was with Justin though, we were with Justin." He also stated, in part, "I don't recall[.] I know I be smoking a lotta weed ... I be so high bro' but I ain't high to where I can't pay attention and notice." Prior to the trial, the State filed a motion in limine, seeking a pretrial ruling on the admission of the defendant's police interview in its entirety. At the hearing on the motion, the State argued that the defendant's statements regarding his marijuana use

20

are not other crimes evidence and that the defendant referenced his marijuana use as an alibi to the instant offenses. The State noted that marijuana was also found at the scene of the shootings. The State argued that statements regarding marijuana use were admissible for the sake of narrative completeness. The trial court found that the evidence regarding marijuana did not consist of inadmissible other crimes evidence and ruled the defendant's interview admissible.

In this case, we find that the references to marijuana constituted res gestae and were properly admitted for the sake of narrative completeness. The State could not have accurately presented its case without the references to the presence and use of marijuana. Further, we note that the erroneous admission of other crimes evidence is subject to a harmless error analysis. **State v. Johnson**, 94-1379 (La. 11/27/95), 664 So.2d 94, 102. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." **Sullivan**, 508 U.S. at 279, 113 S.Ct. at 2081; **Johnson**, 664 So.2d at 100. Here, we do not find that the references to marijuana at trial contributed to the verdicts. Thus, any error in their admission would constitute harmless error in this case. Accordingly, we find no merit in pro se assignment of error number four.

## SPECIAL JURY CHARGE REQUEST

In counseled assignment of error number one, the defendant notes that he made a written request for a special jury charge instruction related to the jury's right to determine the credibility of witnesses and to reject testimony that it did not find credible. The defendant argues that the trial court's refusal to issue the requested instruction prejudiced his right to a fair trial. He asserts that the requested charge provided a correct statement of law. In support of his assertion, he cites **State v. Prestridge**, 399 So.2d 564, 577-78 (La. 1981), a case in which the Louisiana Supreme Court pronounced that an identical charge was "a fair statement of the

jury's function as trier of fact and judge of credibility." The defendant contends that the jury's function of determining witness credibility was preeminent in this case, as the jury was presented with witnesses who had criminal records and who changed their stories concerning the events they witnessed. The defendant contends that the requested jury instruction did not require qualification, limitation, or explanation and was not included in the general charges or any other special charge. Thus, the defendant argues that the exclusion of the requested special charge tainted the verdicts and that a new trial should be ordered.

Louisiana Code of Criminal Procedure article 802 requires the trial court to charge the jury as to the law applicable to the case. The trial court, in pertinent part, shall charge the jury "[t]hat the jury alone shall determine the weight and credibility of the evidence." La. C.Cr.P. art. 802(3). The State and the defendant have the right to submit special written charges for the jury. La. C.Cr.P. art. 807. It is the trial court's duty to give a requested jury charge when it does not require qualification, limitation, or explanation and is not included in the general charges or in another special charge to be given, if it is wholly correct and pertinent to the case. **State v. Powell**, 94-1390 (La. App. 1 Cir. 10/6/95), 671 So.2d 493, 497, writ denied, 95-2710 (La. 2/9/96), 667 So.2d 529. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. **State v. Thomas**, 2010-220 (La. App. 5 Cir. 11/9/10), 54 So.3d 678, 686, writs denied, 2010-2758 (La. 4/25/11), 62 So.3d 89, and 2010-2752 (La. 5/20/11), 63 So.3d 974. It is well settled that requested charges that are already substantially given and covered by the trial court's general charge are properly refused. See La. C.Cr.P. art. 807; **State v. Simmons**, 422 So.2d 138, 141 (La. 1982).

Herein, the motion for the proposed jury instruction cites **Prestridge** and the proposed instruction contains the following language:

> If you believe that any witness in the case, either for the State or the defense, has willfully and deliberately testified falsely to any material fact for the purpose of deceiving you, then I charge you that you are justified in disregarding the entire testimony of such witness as proving nothing and unworthy of belief. You have the right to accept as true, or reject as false, the testimony of any witness accordingly as you are impressed with [his] or her veracity.

In denying the defendant's motion, the trial court stated that the language from **Prestridge** is "somewhat dated" and found that the proposed instruction did not give "anymore enlightenment to the jury on what their responsibilities are than what my charge does."

While the Louisiana Supreme Court in **Prestridge** approved the proposed instruction at issue, the court's decision does not contain a requirement that the same instruction be given in other cases. **State v. Smith**, 96-261 (La. App. 3 Cir. 12/30/96), 687 So.2d 529, 563, <u>writ denied</u>, 97-0314 (La. 6/30/97), 696 So.2d 1004. Based on our careful review of the charges given in this case, we find that it was unnecessary for the trial court to include any additional language. The trial court instructed the jury as follows:

> As jurors, you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and the weight that their testimony deserves, you should scrutinize carefully the testimony and the circumstances under which the witnesses testified.
>
> In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she has testified. His or her manner while testifying, any reason he or she may have to testify in favor of or against the State or the Defendant, and the extent to which the testimony is supported or contradicted by the evidence.

We find that the instruction properly and adequately summarized the law. Taking the instruction as a whole, reasonable persons of ordinary intelligence would

understand the charge as to their duty to evaluate the credibility of witnesses. Thus, counseled assignment of error number one lacks merit.

## JURY POLL

In pro se assignment of error number two, the defendant notes that no written jury poll was conducted in this matter and argues that the oral polling was unclear, as there was no specification as to which count the jurors were being polled on. The defendant notes that the polling did not request each member of the jury to answer yes or no as to the verdict on each count. The defendant argues that where the transcript does not resolve the conflict, the convictions should be reversed.

At the outset we note that our law does not require jury polling in criminal cases, although it allows both the defense and the State to request that the jury be polled. See La. C.Cr.P. art. 812. Herein, after both verdicts were read in this case, the defense attorney asked that the jury be polled. Based on the trial transcript, the jury unanimously confirmed that the verdicts were correct. There was no request for individualized polling on each count. Further, there was no objection to the polling. As the defendant failed to make a contemporaneous objection to the polling procedure, he cannot raise this issue for the first time on appeal. See La. C.Cr.P. art. 841(A); **State v. Amato**, 96-0606 (La. App. 1 Cir. 6/30/97), 698 So.2d 972, 988, writs denied, 97-2626, 97-2644 (La. 2/20/98), 709 So.2d 772. Further, based on our review of the record, there is no indication that the jury's verdicts were improper. We find no merit in pro se assignment of error number two.

## EXCESSIVE/CONSECUTIVE SENTENCES

In a combined argument addressing his excessive sentence claims raised in counseled assignments of error numbers two and three, the defendant notes that the two felonies of which he was convicted arose as part of a common scheme or plan. He submits that the two consecutive life sentences are excessive and that the trial

24

court failed to comply with La. C.Cr.P. art. 894.1(C), which requires the trial court to state for the record the considerations taken into account and the factual basis for the sentence imposed. Citing **State v. Ortego**, 382 So.2d 921, 923 (La.), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980), the defendant further notes that the imposition of consecutive rather than concurrent sentences for crimes arising out of one course of conduct requires particular justification by the trial court. The defendant argues that reviewing courts should consider whether the convictions arose out of a single course of criminal conduct in determining whether sentences are excessive. Finally, the defendant cites **State v. Underwood**, 353 So.2d 1013, 1019 (La. 1977) in arguing that concurrent rather than consecutive sentences are the usual rule for a defendant with no previous criminal record and in the absence of a showing that the public safety requires a longer sentence.

The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. **State v. Sepulvado**, 367 So.2d 762, 767 (La. 1979); **State v. Honea**, 2018-0018 (La. App. 1 Cir. 12/21/18), 268 So.3d 1117, 1120, writ not considered, 2019-00598 (La. 8/12/19), 279 So.3d 915. A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. **State v. Hurst**, 99-2868 (La. App. 1 Cir. 10/3/00), 797 So.2d 75, 83, writ denied, 2000-3053 (La. 10/5/01), 798 So.2d 962.

25

Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the district court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect that the district court adequately considered the criteria. In light of the criteria expressed by article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. **State v. Brown**, 2002-2231 (La. App. 1 Cir. 5/9/03), 849 So.2d 566, 569. Remand is unnecessary when a sufficient factual basis for the sentence is shown. **State v. Lanclos**, 419 So.2d 475, 478 (La. 1982); **State v. Graham**, 2002-1492 (La. App. 1 Cir. 2/14/03), 845 So.2d 416, 422.

Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Courts are charged with applying a statutorily-mandated punishment unless it is unconstitutional. **State v. Dorthey**, 623 So.2d 1276, 1278 (La. 1993). It is incumbent on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional by "clearly and convincingly" showing that: "[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." **State v. Johnson**, 97-1906 (La. 3/4/98), 709 So.2d 672, 676; **State v. Adams**, 2007-0386 (La. App. 1 Cir. 11/2/07), 2007 WL 3407507, at *8, writ denied, 2007-2331 (La. 5/2/08), 979 So.2d 1282.

If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C.Cr.P. art. 883. Thus, La. C.Cr.P. art. 883

26

specifically excludes from its scope sentences which the court expressly directs to be served consecutively. A trial judge retains discretion to impose consecutive penalties based on the offender's past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community. **State v. Thomas,** 98-1144 (La. 10/9/98), 719 So.2d 49 (per curiam). Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. The failure to articulate specific reasons for imposing consecutive sentences does not require remand if the record provides an adequate factual basis to support the consecutive sentences. See **State v. Alexander,** 2020-1337 (La. App. 1 Cir. 10/18/21), 2021 WL 4851320 at *6.

Louisiana courts have upheld consecutive sentences for homicide convictions arising from a single episode, course of conduct, or common scheme. In **Alexander,** 2021 WL 4851320, at *6, this court affirmed consecutive life sentences, noting that Jerrell Alexander, the co-perpetrator of the instant murders, was a repeat offender who was at least a principal in the brutal killing of two victims in broad daylight. In **State v. Miller,** 20-182 (La. App. 5 Cir. 12/23/20), 308 So.3d 1246, 1258-59, writ denied, 2021-00233 (La. 4/27/21), 314 So.3d 838, the appellate court affirmed consecutive life sentences on two convictions of second degree murder where the defendant executed two individuals, took their car, and drove it around for days, as the victims' bodies were decomposing. In **State v. Parker,** 2013-1050 (La. App. 1 Cir. 2/20/14), 2014 WL 687992, at *3, writ denied, 2014-0631 (La. 10/24/14), 151 So.3d 601, cert. denied, 575 U.S. 941, 135 S.Ct. 1714, 191 L.Ed.2d 687 (2015), this court affirmed thirty-five year consecutive sentences on two convictions of manslaughter where the defendant shot one victim twice, another victim once (to "wip[e] out all the witnesses"), and placed child bystanders in danger. In **State v.**

27

**Funes**, 2011-120 (La. App. 5 Cir. 12/28/11), 88 So.3d 490, 509, <u>writ denied</u>, 2012-0290 (La. 5/25/12), 90 So.3d 408, the appellate court affirmed three consecutive life sentences on three convictions of second degree murder where the defendant and co-conspirators planned an armed robbery on a group of unarmed elderly men.[17]

Herein, the trial court imposed mandatory life sentences. Thus, there was no sentencing discretion. Although the crimes occurred during a single episode, two individuals were murdered. Neither victim lived to the age of thirty, as they were twenty-three (Ballard) and twenty-six (Turner) years old at the time of their deaths. While the shootings occurred in the garage, at least one bullet was also fired into the main part of the home where the homeowner, Barbara Hester, was located at the time. Thus, the evidence presented at trial showed that in addition to the deceased victims, other lives were endangered, including Hester and Smith, both of whom managed to escape. The trial court heard Hester's trial testimony regarding her former relationship with her grandson, Ballard, whom she referred to as "my baby." The trial court further heard a victim impact statement from Turner's aunt at the sentencing hearing, regarding the loss to Turner's family. After the impact statement, the trial court asked if the defense had anything to present but the response was negative. The defendant has not argued, nor do we find that a downward departure from the mandatory life sentences is warranted in this case. Further, the record before us clearly establishes an adequate factual basis for the imposition of consecutive sentences. Thus, we find no abuse of discretion in the trial court's imposition of consecutive life sentences in this case. Likewise, we find no error in

---

[17] The appellate court in **Miller** quoted **Funes**, 88 So.3d at 510, noting, "Even if defendant's sentences were excessive because of their consecutive nature, a remand for resentencing would be 'an academic exercise which has no practical benefit to anyone.'" **Miller**, 308 So.3d at 1259 n.15.

the trial court's denial of the motion to reconsider sentence. Counseled assignments of error numbers two and three lack merit.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**